# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAHMOAD ABDAH, *et al.*, ) | |
| Petitioners, ) | |
| v. ) | Civil Action No. 04-1254 (HHK) (RMC) |
| GEORGE W. BUSH, *et al.*, ) | |
| Respondents. ) | |

## MEMORANDUM OPINION

Thirteen Yemeni nationals, designated as "enemy combatants" at the Guantanamo Bay Naval Base ("GTMO") in Cuba, petition for a temporary restraining order ("TRO") to prevent their removal from GTMO and rendition to the custody of another government. They argue that such removal and rendition could have the effect of denying them access to U.S. courts for review of their detainment status and also potentially expose them to interrogation techniques and treatment that would be contrary to the laws of the United States.

Prior to their application for a TRO, the Petitioners had sought a preliminary injunction that would require the Government to give Petitioners' counsel 30-days notice of any such transfer. That matter is set for hearing before Judge Henry Kennedy on March 24, 2005.[1] In the

---

[1] The petition for a TRO is before the undersigned as the emergency motions judge for the weekend. It was filed in a manner consistent with secret documents in these cases at approximately 10:30 p.m. on Friday evening, March 11, 2005. Because the motion was filed on a Friday night *ex parte*, and because some of the materials appended to the motion are classified "Secret," the Court has not had the benefit of an opposition to the petition for a TRO or even argument from Petitioners' counsel, there being no available court reporter with clearance. Its decision here is clearly limited by those circumstances. The Court concludes that it can enter this memorandum opinion and order because it bases its analysis largely on the Government's arguments and factual proffer before Judge Kennedy.

meantime, the *New York Times* ran a story on March 11, 2005, describing a proposal by the Pentagon and Secretary of Defense Donald Rumsfeld to transfer more than half of the GTMO detainees to prisons in Saudi Arabia, Afghanistan, and Yemen.[2] Petitioners' counsel also learned from co-counsel at the Center for Constitutional Rights, "citing information from a person, who, for professional reasons, refuses to make her sources public – that the government intends to transfer many detainees very quickly." Petitioners' *Ex Parte* Motion for Temporary Restraining Order to Prevent Respondents From Removing Petitioners From Guantanamo Until Petitioners' Motion for Preliminary Injunction Is Decided ("Pets.' Motion"), Declaration of Marc D. Falkoff ("Falkoff Decl.") ¶ 3. Petitioners seek an *ex parte* TRO "because they are apprehensive that a public filing will provoke respondents to initiate the exact dark-of-night transfers that petitioners seek to prevent." Pets.' Motion at 2.

## BACKGROUND

The Petitioners' underlying case is one of many *habeas corpus* petitions filed in the District Court for the District of Columbia on behalf of GTMO detainees after the Supreme Court in *Rasul v. Bush* held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing." 124 S. Ct. 2686, 2699 (2004). The Government filed motions to dismiss or for judgment as a matter of law in opposition to many of these *habeas* petitions. Judge Joyce Hens Green, who had been designated to decide common issues of law and fact in eleven of these cases,

---

[2] *See* Pets.' Motion, Exh. C (Douglas Jehl, *Pentagon Seeks to Transfer More Detainees from Base in Cuba*, The New York Times (March 11, 2003)).

granted the motion in part and denied it in part.[3] In a separate case, Judge Richard Leon granted the motion in its entirety.[4] The cases before Judges Green and Leon have been fully briefed in the D.C. Circuit Court of Appeals and are under submission.

Fearful that the Government would transfer the detainees to other countries to avoid further adverse court rulings, the Petitioners have sought a preliminary injunction from Judge Kennedy to require 30-days prior notice of any such transfer. The Government filed its opposition to that petition on March 8, 2005 and described in detail the nature of its process for considering transfer of GTMO detainees. While that process involves high-level contacts between the U.S. Department of State and a foreign government, as well as consideration of a detainee's status by the U.S. Department of Defense, it does not contemplate any coordination or notice to the courts, where constitutional issues are being litigated, or notice to the detainees' counsel.

## LEGAL STANDARDS

A TRO may be granted "without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition . . . ." FED. R. CIV. P. 65(b). The purpose of a TRO is to preserve the status quo and prevent irreparable harm until a hearing can be held. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974).

In considering a request for a TRO, the court must examine whether: "(1) there is a

---

[3] *In re Guantanamo Detainee Cases*, 2005 WL 195356 (D.D.C. Jan. 31, 2005), *appeal docketed*, No. 05-8003 (D.C. Cir. ___ ).

[4] *Khalid v. Bush*, 2005 WL 100924 (D.D.C. Jan. 19, 2005), *appeal docketed*, No. 05-5063 (D.C. Cir. ___ ).

substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction." *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 360 (D.C. Cir. 1999). These factors interrelate on a sliding scale and must be balanced against each other. *Id.* at 361. A strong showing on one factor can outbalance a weaker showing on another.

Where the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (citation omitted). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." *Id.* at 844.

## ANALYSIS

The analysis here needs to define the rights at issue. Petitioners have a pending motion for a preliminary injunction ("PI") to obtain prior notice before they may be transferred to a foreign country for continued detention and, perhaps, interrogation by techniques that may be contrary to the laws of this country. Their motion for a PI, in turn, is designed to protect the Petitioners' rights to have the lawfulness of their current detention at GTMO ruled on by the Court of Appeals.

As defined by the Supreme Court, "'the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest.'" *Rasul*, 124 S. Ct. at 2692 (quoting *INS v. St. Cyr*, 533 U.S. 289, 301 (2001)). "Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land." *Id.* (quoting *Shaughnessy v. United States ex. rel. Mezei*, 345 U.S. 206, 218-219 (1953) (Jackson, J., dissenting)). The "law of the land" is interpreted and applied in this country by its court systems.

Detainees at GTMO may be transferred to the control of another government, generally to their country of citizenship, for release. Respondents' Memorandum in Opposition to Petitioners' Motion for Order Requiring Advance Notice of Any Repatriations or Transfers From Guantanamo ("U.S. Opp.") at 3; Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman ("Waxman Decl.") ¶ 3; Declaration of Ambassador Pierre-Richard Prosper ("Prosper Decl.") ¶ 3. "The United States also transfers Guantanamo detainees, under appropriate conditions, to the control of other governments for investigation and possible prosecution and continued detention when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies." U.S. Opp. at 3; *see also* Pets.' Motion, Exh. F.

The Petitioners have adequately shown that they could face continued detention at the request of the United States, or as a condition of their release from GTMO set by the United States, in any country to which they might be transferred even if, after the transfer, that foreign nation assumed full responsibility and control over their terms of incarceration and the United States

fully relinquished such responsibility and control.

        A.      <u>Likelihood of Success on the Merits</u>

*Habeas corpus* challenges the detention of the petitioner. The Government wants at least some of the GTMO detainees to remain in detention, even if transferred to the control of foreign nation. Once transferred, however, their *habeas* petitions would become moot because the courts in the United States would no longer have control over their warden.

The Government argues to Judge Kennedy, in its opposition to the Petitioners' request for a preliminary injunction, that "[t]here is no legal basis for judicial intervention in the processes by which enemy combatant detainees are repatriated or transferred, and any such interference would illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." U.S. Opp. at 1. Obviously, the Petitioners' request for 30-days advance notice of any transfer is not at issue here and will not be decided. For purposes of the TRO, however, the Court finds that it would not be necessary in any way to intrude into foreign relations or negotiations over repatriation or transfer. The Court need only assess whether removing the detainees from the jurisdiction of the Court – while insisting on their continued detention – is subject to a temporary injunction so that the legality of that detention *ab initio* can be determined and the trial judge can decide whether prior notice is appropriate. These issues are "'so serious, substantial, difficult and doubtful'" as to warrant maintaining the status quo "whether or not movant has shown a mathematical probability of success." *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844 (citation omitted).

There is no doubt that the district courts have jurisdiction over the Petitioners' *habeas corpus* petitions. *Rasul*, 124 S. Ct. at 2698. There is also no doubt that "the All Writs

Act, 28 U.S.C. § 1651(a), empowers a district court to issue injunctions to protect its jurisdiction . . . ." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996). The Government resists this conclusion by arguing that Judge Green stayed these cases "for all purposes" and that there is no jurisdiction remaining in the district court. The Court disagrees.

The appeal from Judge Green's ruling is interlocutory; the rest of the case remains with Judge Kennedy and with the undersigned as the emergency motions judge. Because Judge Green's ruling was so fundamental to the very rights of these litigants in the federal courts – and because Judge Leon's ruling disagreed – Judge Green ordered an administrative stay to save time, money and judicial resources. Such a stay could not be read to also deprive the Petitioners of their rights to seek emergency assistance when faced with continued detention at the request of the United States but no venue in which to challenge its legality.

The Court expresses no opinion on the likelihood that Petitioners will succeed in their request for a 30-day notice prior to any transfer to a foreign country. Instead, it rules that the Petitioners have at least a fifty-fifty chance of prevailing on their constitutional claims before the Court of Appeals and that they raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, while insisting on continued detention, is within the province of the executive.

B.      Irreparable Harm

Were the Petitioners to be transferred to the control of a foreign country, they would effectively lose their rights to pursue their *habeas* claims in this country. The Court finds that their injury would be continued detention outside the jurisdiction of U.S. courts – courts that are actively reviewing the constitutionality of that very detention. While the Supreme Court has

-7-

granted them a right of access to our court system, such a transfer would terminate that right, insofar as it sounds in *habeas corpus*, because U.S. courts would no longer have control over their warden.  Presumably, the Petitioners would suffer no harm if the Government were to transfer them to Yemen for release; that is the goal of their *habeas* petitions.  A transfer with continued indeterminate detention with no right of review or further court access poses a very different set of parameters.  With or without the allegation of improper forms of interrogation in a foreign country, the Court concludes that a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners.

>Nonetheless, the Court pauses over whether the Petitioners have shown the immediacy of potential harm that justifies a TRO before the Government or its attorney could be heard.  FED. R. CIV. P. 65(b) (TRO may be granted without notice only if "it clearly appears from specific facts . . . that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition.").  The only evidence of immediacy here is third- or fourth-hand hearsay: co-counsel at the Center for Constitutional Rights told Petitioners' counsel that s/he was informed by an unnamed person that another unnamed source confided that the Government intends to transfer many detainees – who may or may not include any of the instant Petitioners – "very quickly."  The reliability of such information cannot be ascertained.  Yet the Government has already denied a request from counsel for the Petitioners that it informally agree to give advance notice of any transfer and it clearly regards such notice as an intrusion into the executive sphere of foreign relations.  Consequently, the Petitioners state that they filed *ex parte* to avoid precipitating any hasty action by the Government to avoid addressing such transfers-and-continued-detention in a U.S. court.

What is evident from the record is that the Pentagon and the State Department are working together to arrange for some numbers of unspecified GTMO detainees to be transferred to foreign nations and detained for uncertain periods. The Government refuses to give any advance notice of such transfers. Approximately 200 detainees have already been transferred, sixty-five of whom were sent abroad on the condition that they continue to be detained. Prosper Decl. ¶ 2. "Of those 65 detainees who have been transferred to the control of host governments, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to Morocco, 6 to France, 4 to Saudi Arabia, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait, and 1 to Australia." *Id*. That this process continues is acknowledged by the United States. "Among the assurances sought in every transfer case in which continued detention by the government concerned is foreseen is the assurance of humane treatment . . . ." *Id*. ¶ 6. Under these circumstances, the only way that anyone could know that a transfer is about to happen, *i.e.,* be "immediate," is if one is within the chain of command within the federal departments that consult on such matters or if there were information revealed *sotto voce* to a reporter. Based on the totality of the circumstances, the Court finds that the Petitioners face a risk of irreparable harm that is sufficiently immediate to warrant temporary relief.

      C.    <u>Injury to the Government</u>

The Court can see no injury to the Government from granting a temporary injunction here. At most, this injunction will be alive for ten days unless both parties agree to its continuation or Judge Kennedy extends it another ten days. Nothing about this injunction will serve to prevent the Government's diplomatic and other efforts to arrange transfers of Guantanamo Bay detainees but it will ensure that a judicial officer reviews the Petitioners' rights

to prior notice and/or retention in this jurisdiction before the Government actually carries out any such transfer.

        D.     <u>Injury to the Public Interest</u>

The Court can see no injury to the public interest from granting a temporary injunction here.

## CONCLUSION

For the reasons stated, the *Ex Parte* Motion for a Temporary Restraining Order will be GRANTED. The Temporary Restraining Order accompanies this memorandum opinion.

DATE: March 12, 2005.        /s/
                                                  ROSEMARY M. COLLYER
TIME: 3:40 p.m.                  United States District Judge