UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   :
**MAJID ABDULLA AL-JOUDI,**         :
**et al.**,                         :
                                   :
    **Petitioners**,                :
                                   :
    v.                             :    **Civil Action No. 05-301 (GK)**
                                   :
**GEORGE W. BUSH, et al.**,         :
                                   :
    **Respondents**.                :
_____:

### MEMORANDUM OPINION

Petitioners, four Saudi Arabian nationals, bring this action against Defendants, seeking release from the Guantanamo Bay Naval Station ("GTMO") in Cuba, where they are being detained.[1] This matter is before the Court on Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court with 30-Days' Advance Notice of Any Intended Removal from Guantanamo. Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Petitioners' Motion is **granted**.

---

[1] Petitioners are Majid Abdulla Al-Joudi, Yousif Mohammad Mubarak Al-Shehry, Abdul-Hakim Abdul-Raman Al-Moosa, and Abdulla Mohammaed Al-Ghanmi. There are four other Petitioners, who are Next Friends of the detainees. The Next Friends obviously are not subject to transfer from Guantanamo. All references herein will be to the Petitioners who actually are being detained.

I.  **BACKGROUND**

   A.  **Procedural History**

Petitioners are being detained at GTMO and have been classified as enemy combatants.[2]  On February 9, 2005, they filed a Petition for Writ of Habeas Corpus in this Court.  They are among many GTMO detainees who have filed such petitions in the United States District Court for the District of Columbia since the Supreme Court held that "the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing."  Rasul v. Bush, 124 S. Ct. 2686, 2699 (2004).

On January 19, 2005, Judge Richard Leon granted the Government's Motion to Dismiss the detainees' Petition for Writ of Habeas Corpus in Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005).  On January 31, 2005, Judge Green granted in part and denied in part the Government's Motion to Dismiss in eleven cases consolidated pursuant to the September 15, 2004, Resolution of the Executive Session.  In re Guantanamo Cases, 355 F. Supp. 2d 443 (D.D.C. 2005).[3]  The cases before Judges Leon and Green have been fully

---

[2] Petitioners' counsel has not yet been able to meet with her clients and therefore has very limited knowledge of Petitioners' precise circumstances.  Upon receiving the proper security clearances, which counsel hopes to obtain in the near future, she will travel to Cuba to meet with her client. Transcript of Motions Hearing ("Tr.") at 15 (March 30, 2005).

[3] Judge Green's Memorandum Opinion and Order did not apply to the instant case, which was filed after the release of her Opinion.

2

briefed in the United States Court of Appeals for the District of Columbia and are under submission.

On February 3, 2005, Judge Green granted a stay in the eleven cases to which her January 31, 2005, Opinion and Order applied. A Motion to Stay the instant case until resolution of Khalid and In Re Guantanamo Cases is pending in this Court.

**B.  Transfers from GTMO**

Approximately 540 foreign nationals currently are being held at GTMO. Decl. of Matthew C. Waxman ¶ 2 ("Waxman Declaration").[4] The Department of Defense ("DOD") states it is conducting a review of each detainee's case, at least annually, to determine whether continued detention is warranted. Id. at ¶ 3. Since the Government began detaining individuals at GTMO, the DOD has transferred 211 detainees to other countries. Id. at ¶ 4.

Detainees are subject to two types of transfer: (1) transfer to the custody of another country, with the understanding that they will be released, Tr. at 22-23; and (2) transfer to the custody of another country with the understanding that the country's government has "an independent law enforcement interest" in them and that they likely will face continued detention and processing by that country's judicial system. Id. at 24. In each case, the United States loses all control of the detainees once they are transferred to another country. Waxman Decl. at ¶ 5.

---

[4] Waxman is the Deputy Assistant Secretary of Defense for Detainee Affairs. Id. at ¶ 1.

3

Of the 211 detainees who have been transferred, 146 have been transferred with the understanding that they would be released. Id. at ¶ 7. The Government represents that most of those individuals actually have been released, Tr. at 29, but it cannot provide precise numbers. Id.

Sixty-five detainees have been transferred to the control of other countries for detention. Waxman Decl. at ¶ 7. Of that group, 29 were transferred to Pakistan; 9 to the United Kingdom; 7 to Russia; 5 to Morocco; 6 to France; 4 to Saudi Arabia; and 1 each to Australia, Denmark, Kuwait, Spain, and Sweden. Id..

When transfers for detention are being considered, DOD coordinates with various other Government agencies, including the Department of State ("DOS"). Id. ¶ 6. The Government states that, as a matter of policy, it does not "repatriate or transfer individuals to other countries where it believes it is more likely than not that they will be tortured." Id..

The Government claims that it ensures compliance with this policy by obtaining "assurances" from officials within the foreign government. The process for obtaining such assurances "involves a frank dialogue, discussion, [and] communication with officials of the other government." Tr. at 32. The Government evaluates the adequacy of the assurances by considering "the identity, position, or other information concerning the official relaying the assurances," Decl. of Pierre-Richard Prosper at ¶ 8 ("Prosper

4

Declaration")[5]; political or legal developments in the country that would provide context for the assurances, id.; and U.S. relations with the country. Id. Senior Government officials ultimately make the final decision on whether to transfer a detainee. Waxman Decl. at ¶ 7. The Government's papers do not indicate which DOD official has this responsibility.

In recent months, a number of newspaper articles about the transfer and treatment of detainees have been published. Some, for example, quote former employees of the United States government who have been involved in transferring detainees to other countries, including countries that practice torture. See, e.g., Dana Priest, Jet Is an Open Secret in Terror War, Wash. Post, Dec. 27, 2004, at A1. In addition, some quote by name former Guantanamo detainees who allege that they have been moved by the United States government to countries where they have been tortured. See, e.g. Douglas Jehl and David Johnson, Rule Change Lets C.I.A. Freely Send Suspects Abroad, N.Y. Times, Mar. 6, 2005, at A1.

On March 11, 2005, an article in The New York Times reported that DOD plans to transfer "hundreds of suspected terrorists to prisons in Saudi Arabia, Afghanistan, and Yemen." Douglas Jehl, Pentagon Seeks to Shift Inmates from Cuba Base, N.Y. Times, Mar. 11, 2005, at A1.

---

[5] Prosper is the Ambassador-at-Large for War Crimes Issues and has supervised the operation of the DOS Office of War Crimes Issues. Id. at ¶ 1.

5

In response to this article, several petitioners, including the Petitioners in the instant case, filed motions for temporary restraining orders and preliminary injunctions. On March 12, 2005, Judge Rosemary Collyer granted a request for a temporary restraining order in <u>Abdah v. Bush</u>, No. 04-CV-1254 (D.D.C. March 12, 2005) (order granting temporary restraining order) and denied a similar request in <u>John Does 1-570 v. Bush</u>, No. 05-CV-313 (March 12, 2005) (order denying request for temporary restraining order). On March 29, 2005, Judge Henry H. Kennedy granted a Preliminary Injunction in <u>Abdah</u>.

After the Motion was filed in the instant case, the Government represented to this Court that none of the parties were scheduled for transfer within the next several weeks. In addition, counsel for all parties agreed to a combined hearing on the request for a temporary restraining order and the request for a preliminary injunction. On March 17, 2005, based on those representations, the Court scheduled the hearing on the Motion for March 30, 2005.

**II. STANDARD OF REVIEW**

In considering Petitioners' request for a preliminary injunction, the Court must consider four factors: (1) whether Petitioners would suffer irreparable injury if an injunction were not granted; (2) whether Petitioners have a substantial likelihood of success on the merits; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest. <u>Al-Fayed</u>

6

v. CIA, 254 F.3d 300, 303 (D.C. Cir. 2001).[6]  "These factors interrelate on a sliding scale and must be balanced against each other." Serono Labs, Inc. v. Shalala, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995).

When the balance of hardships tips decidedly toward the movant, it will "ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977) (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953)).  "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." Id. at 844.

---

[6] The same factors apply when considering a request for a temporary restraining order. Al-Fayed, 254 F.3d at 303, n.2. However, since the Court has granted the Motion for Preliminary Injunction, it is not necessary to apply these factors to their Motion for Temporary Restraining Order.

## III. ANALYSIS

### A. Harm to Petitioners

Petitioners argue that they will suffer irreparable harm if transferred to the custody of another country that practices torture or other inhumane treatment of prisoners. Respondents argue that there is no potential harm to Petitioners, because there is no credible evidence that detainees are being transferred to countries that practice torture; instead, any transfers will be largely for purposes of release.[7]

Irreparable harm to the moving party is "the basis of injunctive relief in the federal courts." CityFed Fin. Corp., 58 F.3d at 747 (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)). To obtain preliminary injunctive relief, Petitioners must show that the threatened injury is not merely "remote and speculative." Milk Indus. Found. v. Glickman, 949 F. Supp. 882, 897 (D.D.C. 1996).

In this case, there are two obvious and substantial threats to Petitioners. First, they face the possibility of transfer to a country where they might be tortured or indefinitely confined,

---

[7] The Government also argues that transferring Petitioners from United States custody provides them with the very relief they seek. Tr. at 40. That argument is overly simplistic, however. Petitioners ultimately seek total freedom from all custody, not just United States custody. They can only obtain such relief in this litigation if the Court determines that their underlying detention was unconstitutional or illegal. Furthermore, a determination by a United States court that Petitioners are not enemy combatants might carry significant weight in their home country, thereby facilitating release from custody if they were transferred for continued detention. Finally, on the most human level, proud people have a strong interest in clearing their names from association with acts of violence and terrorism.

8

which undeniably would constitute irreparable harm. While the Government presents declarations that attempt to mitigate these concerns, they neither refute Petitioners' claims nor render them frivolous.[8] Indeed, the Government admits that 65 of the 211 detainees transferred to date have been transferred for detention, not release. Several of the 65 have been transferred to countries that our own State Department has acknowledged torture prisoners, including Pakistan, Saudi Arabia, and Morocco. See Country Reports on Human Rights Practices -- 2004, available at http://www.state.gov/g/drl/rls/hrrpt/2004. Finally, the Government was unable to provide any details about the type or form of "assurances" given, the scope of the monitoring that takes place after transfer, or the consequences of noncompliance.[9] Tr. at 32-33. In short, the threatened injury is not merely remote and speculative; it is a serious potential threat.

Second, Petitioners face the threat of irreparable harm based on the potential elimination of their habeas claims. It is unclear at this point whether transferring Petitioners would strip this Court of jurisdiction. See Abdah v. Bush, No. 04-CV-1254, Slip op. at 7 (D.D.C. March 29, 2005) (transfer to another country "would effectively extinguish [Petitioners'] habeas claims by fiat"); but

---

[8] The Court notes that the Government's affidavits do not address the Central Intelligence Agency's involvement in any transfer or "rendition" programs.

[9] Notably, the Government was also unaware of several other important facts, such as the availability of extradition treaties with Qatar or Saudi Arabia, or the consequences if a detainee's home country refuses to accept him.

9

see Abu Ali v. Ashcroft, 350 F. Supp. 2d 28, 54 (D.D.C. 2004) (holding that an individual detained in Saudi Arabia could survive a motion to dismiss his habeas claim based on the theory of constructive custody).  However, given the danger that, upon transfer, the Court could lose jurisdiction to adjudicate Petitioners' claims, it follows that such a transfer could obviate Petitioners' right to "test the legitimacy of [their] executive detention."  Lee v. Reno, 15 F. Supp. 2d 26, 32 (D.D.C. 1998).  Since such a turn of events would certainly constitute a threat of irreparable harm, an order preserving the status quo in this case is appropriate.[10]

   Both threats are imminent.  While the Court certainly has relied upon the Government's representations that Petitioners will not be transferred in the next several weeks, the Government is clearly maintaining its right to transfer them at any time after the Court rules upon the instant Motion.  Thus, the threats are not distant or speculative, and transfer could occur in the near future.

---

[10] The Court has the authority to issue such an injunction pursuant to the All Writs Act, 28 U.S.C. § 1651(a), which "empowers a district court to issue injunctions to protect its jurisdiction." SEC v. Vison Communications, Inc., 74 F.3d 287, 291 (D.C. Cir. 1996); see also Abdah v. Bush, No. 04-CV-1254, slip op. at 7 (March 12, 2004); Abu Ali, 350 F. Supp. 2d at 54 (quoting Alabama Great S. R. Co. v. Thompson, 200 U.S. 206, 218 (1906)) ("It is well-established that 'the federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals.'").

**B.     Likelihood of Success on the Merits**

Petitioners contend that, given Judge Green's Opinion in In re Guantanamo Cases, they have a substantial likelihood of success on the merits of their habeas claim.  The Government responds that Petitioners' claim would be barred because the treaties under which they seek review are non-self-executing, and because the review sought would encroach upon the foreign policy authority of the executive.

To justify granting a preliminary injunction, Petitioners need not show "a mathematical probability of success."  Washington Metro. Area Transit Comm'n, 559 F.2d at 844.  Rather, "it will ordinarily be enough" that the questions raised are so "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation."  Id. (quoting Hamilton Watch Co., 206 F.2d at 740).

The exact chances of success in this case are extremely difficult to assess.  It is clear, however, that, at a minimum, Petitioners have raised "fair ground[s] for litigation." Washington Metro. Area Transit Comm'n, 559 F.2d at 844.  The issues raised in these motions are sensitive and involve complex constitutional questions.  Indeed, there are areas of disagreement even among the judges on this Bench about the legal issues raised in these Petitions.  Like the issues in Hamdi v. Rumsfeld, Padilla v. Rumsfeld, and Rasul, there is a strong probability that they ultimately will be resolved by the Supreme Court.

11

For example, there is disagreement about whether the detainees have any constitutional rights at all. See Khalid, 355 F. Supp. 2d 311 (holding that Guantanamo detainees have no constitutional rights); but see In re Guantanamo Cases, 355 F. Supp. 2d 311 (holding that Guantanamo detainees have some constitutional rights). There is also disagreement over whether the Court will lose jurisdiction over the cases if Petitioners are transferred to another country.[11] See Abdah v. Bush, No. 04-CV-1254, slip op. at 7 (D.D.C. March 29, 2005); but see Abu Ali v. Ashcroft, 350 F. Supp. 2d at 54. And, there is disagreement about whether the Geneva Conventions are self-executing. See Hamdan v. Rumsfeld, 344 F. Supp. 2d 152, 164 (D.D.C. 2004).

In short, even though the mathematical probability of success is impossible to assess, there can be no doubt that the questions raised here are so "serious, substantial, difficult, and doubtful," as to make them a "fair ground for litigation." Washington Metro. Area Transit Comm'n, 559 F.2d at 844.

---

[11] The Government also argues that the Supreme Court in Rasul failed to protect its jurisdiction over detainees that were transferred. Rasul, 124 S.Ct. at 2690 n.1 (noting that two petitioners had been "released from custody" to the United Kingdom). However, the issue of transfer was not before the Court, and the Rasul petitioners were released to the United Kingdom, not a country known to torture its prisoners. See Country Reports on Human Rights Practices: United Kingdom, available at http://wwws.state.gov/g/drl/rls/hrrpt/2004/41716.htm. ("[t]he [British] Government generally respected the human rights of its citizens").

12

### C. Harm to Government

Petitioners argue that there is absolutely no harm to the Government if it is required to provide the Court and Petitioners' counsel with 30 days' notice before transferring them to another country. The Government contends, however, that there is great potential harm to its ability to conduct negotiations with foreign governments regarding the transfer and subsequent release of GTMO detainees, because such negotiations are often conducted in secret and divulging their details could seriously impair their success.

The Court fails to see any injury whatsoever that the Government would suffer from granting the requested preliminary injunction. Petitioners request only 30 days' notice of transfer -- a narrow and discrete request that would impose no burden on the Government. Beyond "vague premonitions" that such relief would harm the executive's ability to conduct foreign policy, there is no concrete evidence that such notice actually will intrude upon executive authority. Abdah, slip op. at 10 (D.D.C. March 29, 2005). For example, granting Petitioners' request for 30 days' notice of transfer would not require the Court to second-guess foreign policy decisions of the Executive, would not require the Government to divulge information relating to its negotiations with foreign governments, and would not prevent the Government from speaking with one voice.[12]

---

[12] Such issues could arise if Petitioners ultimately are scheduled for transfer and actually request additional relief. However, speculation about future requests is no justification for denying the narrow relief requested at this point.

13

In weighing the respective hardships imposed upon the parties, the balance clearly tilts in favor of Petitioners. The requested relief does not constitute even a minimal burden on the Government; at most, it would require the Government to file a few pieces of paper. Such a minimal consequence does not outweigh the imminent threats of indefinite detention, potential torture, and the elimination of Petitioners' claims before this Court.

**D.   Public Interest**

Petitioners argue that the public has a strong interest in protecting the constitutional rights of detainees. The Government responds that the requested relief would be contrary to the public interest, because it could frustrate the Government's ability to conduct foreign policy, which ultimately could harm the nation by impairing the effectiveness of the war on terrorism.

The Government's argument is unpersuasive, however, for it "simply conflate[s] the public interest with [the Government's] own position," Abdah, 04-CV-1254, slip op. at 11 (March 29, 2005), and asks the Court to accept its predictions of harm without challenge. This the Court is not prepared to do. It is obvious beyond words that there is a strong public interest in the zealous pursuit of those who wish to commit acts of terrorism against the United States and its citizens. However, the narrow relief sought in this case will not compromise that effort in any way.

In contrast, the public interest undeniably is served by ensuring that Petitioners' constitutional rights can be adjudicated

14

in an appropriate manner.  G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[i]t is always in the public interest to protect the violation of a party's constitutional rights").  Retaining jurisdiction over this case is essential to protecting that public interest.  Thus, the public interest clearly favors entering the preliminary injunction sought by Petitioners.

## V. CONCLUSION

Petitioners have requested 30 days' notice of any transfer from GTMO, a concrete, narrow, and minimally burdensome remedy.  Based on the Court's analysis of the four relevant factors set forth in the applicable caselaw, it is clear that Petitioners have satisfied their burden.  They are faced with an imminent threat of serious harm, which far outweighs any conceivable burden that the Government might face.  Furthermore, while it is not possible to demonstrate a "mathematical probability of success," the questions are "serious, substantial, difficult and doubtful."  Washington Metro. Area Transit Comm'n, 559 F.2d at 844.  Certainly, the Government cannot argue that its success on the merits is a foregone conclusion.  Finally, the public interest in granting Petitioners the requested relief is strong.  Therefore, for the foregoing reasons, Petitioners' Motion for a Temporary Restraining Order and Preliminary Injunction Requiring Respondents to Provide Counsel for Petitioners and the Court with 30-Days' Advance Notice of Any Intended Removal from Guantanamo is **granted.**

15

An Order will issue with this Opinion.

_____  /s/
April 4, 2005          _____
                        Gladys Kessler
                        United States District Judge

**Copies to:  Attorneys of Record via ECF**

16